IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LARRY GIBSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 14 C 8043 |
| | ) |
| GHALIAH OBAISI, independent executor of the estate of DR. SALEH OBAISI, LATONYA WILLIAMS, DR. ANN HUNDLY-DAVIS, and WEXFORD HEALTH SOURCES, INC., | ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Larry Gibson, a former inmate at Stateville Correctional Center, has sued members of the prison's medical staff and the corporation providing healthcare services to the prison under 42 U.S.C. § 1983 for allegedly violating his Eighth Amendment rights. Gibson alleges that Stateville's former medical director, Dr. Saleh Obaisi,[1] other members of the medical staff—physician assistant Latonya Williams and Dr. Ann Davis[2]—and their employer, Wexford Health Sources, Inc., disregarded his complaints of wrist, shoulder, and bicep injuries after he was handcuffed by prison staff in 2012. He contends that their disregard amounted to deliberate indifference to his serious

---

[1] Dr. Obaisi passed away in 2017, and the administrator of his estate has been substituted in his place as a defendant.
[2] The parties are inconsistent in whether they refer to this defendant as Dr. Davis or Dr. Hundley-Davis. The Court adopts Dr. Davis's lawyers' approach.

medical condition. The defendants have moved for summary judgment. For the reasons below, the Court grants the motion in part and denies it in part.

## Background

The following facts are undisputed except where otherwise noted. Larry Gibson was an inmate at Stateville Correctional Center from May 2006 until April 2016. During that time, he experienced a number of health problems, including issues with his shoulders, biceps, and wrists. Although the defendants' motion for summary judgment and filing under Local Rule 56.1 combined the claims underlying this case with those underlying another suit filed by the same plaintiff, *Gibson v. Obaisi*, No. 15-6358 (N.D. Ill.), the following account is limited to facts relevant to the above-captioned matter.

Gibson contends that his shoulder, bicep, and wrist problems stem from his being handcuffed too tightly during searches by Stateville guards in June and July 2012. Gibson testified that during first of these searches, which occurred on June 11, he was tightly handcuffed for several hours while a Stateville guard team nicknamed "Orange Crush" searched his housing unit. He says that he complained to a corrections officer that the cuffs were causing him pain but was ignored. Gibson further testified that, after a period in the handcuffs, he experienced burning in his wrist and popping in his shoulders. Gibson was again handcuffed during a second search that occurred on July 14. A few days after this second search, Gibson experienced a pop in his left bicep as he attempted to move a box. Gibson testified that he immediately started requesting medical care, filing grievances, and writing letters to providers requesting assistance.

Gibson saw on-unit medical personnel on July 28, complained of his pain, and was scheduled for a visit with physician assistant Williams on August 13. At that visit,

2

Gibson recounted the popping and pain he had experienced and presented with decreased range of motion and strength, as well as a deformity in his left upper arm. Williams concluded a bicep rupture was possible. *See* Williams Dep., Ex. C to Defs.' L.R. 56.1 Stmt., dkt. no. 126-4, at 49:21-22 (testifying that a bicep rupture was "something that I thought should be ruled out"). Williams further noted that Gibson was previously diagnosed with gastroesophageal reflux disease (GERD), which influenced the appropriate pain treatment. Williams prescribed GERD medication and referred Gibson to see Dr. Obaisi, then Stateville's medical director,[3] two days later on August 15. Obaisi assessed Gibson again and referred him for physical therapy. Two days later on August 17, Gibson filed another grievance. This time he complained that he needed an x-ray or MRI or of his left arm. He also complained of burning and aching in his left wrist.

      Six weeks passed, and Gibson's physical therapy referral languished. He saw Williams again on October 4, but this time he complained of right shoulder and arm pain. Williams noted full range of motion, good strength and sensation, and no deformity. To address the pain, Williams prescribed Gibson with an analgesic balm and the anti-inflammatory medication Naproxen and counseled him about how to move the arm so as not to exacerbate the symptoms. The record of this visit suggests that Gibson did not complain of pain in his left arm but rather focused on his right arm.

---

[3] In their opening brief, the defendants note that they "[a]ssum[e] *arguendo* that the medical director referenced was Dr. Obaisi." Defs.' Br. in Supp. of Mot. for Summ. J., dkt. no. 125, at 8. They do not, however, present any substantive argument that another roving medical director may have taken Dr. Obaisi's place for the period in question. The Court therefore concludes that the medical director who saw Gibson on August 15 was, in fact, Dr. Obaisi.

Following this visit, Gibson again filed a grievance, this time complaining that his "right arm is coming loose" and again requesting an MRI or CAT scan. Ex. F to Defs.' L.R. 56.1 Stmt., dkt. no. 126-7, at 45-46.

In the following months, Gibson saw members of the Stateville medical team for treatment of conditions unrelated to those at the heart of this suit. Then, in early March 2013, Gibson again saw Williams about neck and shoulder pain. Williams modified Gibson's GERD prescription, ordered him ice and analgesic balm for pain relief, and referred him for an x-ray of his shoulder and spine. The x-ray revealed an abnormal curvature of Gibson's cervical spine, but later testing indicated that that condition was the temporary result of a muscle spasm. The x-ray also ruled out dislocation or fracture of Gibson's shoulder.

Gibson saw Dr. Obaisi again in mid-April 2013. Gibson presented with ongoing pain in his left shoulder and limited range of motion—he was unable to lift his arm higher than ninety degrees from his shoulder. Dr. Obaisi diagnosed Gibson with entrapment syndrome and gave him a steroid injection for the shoulder. Following the April visit, Gibson filed another grievance on June 17. He again complained of limited range of motion as well as a burning sensation in his right shoulder.

On July 13, 2013, Gibson saw a nurse for an unrelated eye issue. During that visit, he complained of a stabbing pain in his neck and shoulder. He was given an analgesic balm and Tylenol, as well as a referral to see Dr. Davis on July 23. At this visit, Dr. Davis noted that Gibson complained of shoulder and neck pain, tenderness in his shoulder and acromioclavicular joint, and soreness in his trapezius muscle. Dr. Davis did not note any signs or symptoms of bicep rupture. She suspected that Gibson

suffered from osteoarthritis, an incurable progressive and degenerative form of arthritis. Dr. Davis prescribed Naproxen and analgesic balm. Following this visit, Gibson filed another grievance, this time requesting not only imaging of his arm but also surgery to address his arm and shoulder pain.

In August 2013, Gibson again saw physician assistant Williams. He advised her that the Naproxen was no longer working. Williams prescribed Motrin instead. Also in August, Dr. Davis reviewed patient referrals for physical therapy in an effort to address a significant backlog. She concluded that Gibson's physical therapy referral should be cancelled pending a reevaluation because the injury that prompted the order was no longer recent or acute. Dr. Davis canceled the referral but did not know, during her deposition, whether Gibson was ever reevaluated. Gibson notes that the only reason his injury was no longer recent or acute at the time of Dr. Davis's review was that his August 2012 referral for physical therapy had languished for an entire year without action. In any event, Gibson undisputedly never received physical therapy.

In February 2014, after being involved in an altercation with his cellmate, Gibson again saw Dr. Davis. This time Gibson complained of a swollen wrist and a crackling jaw. Dr. Davis examined Gibson and gave him Tylenol and an injection of Toradol along with Zantac to address the upset stomach that Toradol often causes. Dr. Davis also ordered x-rays of Gibson's mandible, left shoulder, ribs, both hands, and both wrists. The x-rays showed moderate degenerative joint disease—that is, arthritis—in Gibson's hands and wrists. (Gibson contends that the x-rays actually showed acute carpal tunnel syndrome requiring immediate surgical intervention. This distinction is addressed below.)

5

Several months later, in June 2014, Gibson saw an unnamed provider at the medical unit complaining of left hand and wrist pain. He was referred to see Dr. Obaisi, who provided a non-steroidal anti-inflammatory drug, Robaxin, as well as a muscle relaxant.  In September 2014, Gibson again saw Dr. Obaisi, this time complaining that his left shoulder was hurting because of cold weather.  Dr. Obaisi ordered Motrin, another non-steroidal pain reliever.  At a follow-up appointment in November 2014, Gibson again complained of stiffness and pain in his shoulder and was again given a steroid injection for inflammation relief.

In June and August 2015, Gibson saw Dr. Obaisi for neck and back pain.  In June, Dr. Obaisi ordered additional spinal x-rays and gave Gibson an abdominal binder.  In August, Dr. Obaisi prescribed Gibson with Movic, a pain reliever, and gave him medication for a sore throat.  Two days later, on August 7, Gibson experienced an acute episode of pain and nearly fainted.  He was transported to a nearby hospital where a CT scan of his spine revealed degenerative arthritic changes.  Gibson saw Williams and Dr. Obaisi again in October, November, and December 2015 regarding his back issues.  Each time he was provided a different medication that gave him temporary relief.

Finally, in December 2015, Gibson saw Dr. Obaisi again complaining of wrist pain.  He received Motrin for the pain and underwent blood testing for rheumatoid arthritis.  About four months later in April 2016, Dr. Obaisi reviewed Gibson's most recent x-rays and concluded that his wrist was not fractured.  He again ordered blood work to assess rheumatoid arthritis and prescribed Gibson Tylenol, vitamin D, and Prilosec.

Later in April 2016, Gibson was transferred from Stateville to Hill Correctional

Center. Although this suit does not address care Gibson received at Hill, testing and treatment he received there bears on the Court's analysis of his claims. Specifically, in May 2016 shortly after he was transferred, a physician at Hill reviewed Gibson's medical records and diagnosed him with chronic degenerative disc disease and arthritis. Then, in June 2016, Hill medical staff saw Gibson for wrist pain and cramping. He did not, at that time, show any swelling or redness and was offered only Tylenol to address the pain. On July 11, Gibson again presented with wrist pain, but this time his wrists were swollen, and he had limited range of motion and other symptoms. He was referred to see a physician. On July 15, the physician noted that the swelling had ceased but that Gibson continued to have limited range of motion in his right wrist. The physician ordered x-rays of Gibson's hands and wrists and prescribed an anti-rheumatic drug. The x-rays showed severe osteoarthritis in Gibson's left wrist—which the imaging suggested may previously have been fractured—and moderate osteoarthritis in his right wrist. After Gibson suffered a fall in August 2016, another set of x-rays were ordered on his right side, which confirmed the osteoarthritis in his wrist and also indicated moderate osteoarthritis in his right acromioclavicular joint.

Gibson was then referred to a hand specialist. The specialist concluded that Gibson had arthritis and carpal tunnel syndrome in both hands. He was prescribed ibuprofen and given a permit to be cuffed with his hands in front of him rather than behind him. Gibson was also referred for surgery on both wrists to address the carpal tunnel syndrome. At the time of his deposition, he reported that the surgery had stopped his left wrist from "going to sleep" but had not eliminated his pain. The surgery on his right wrist had occurred only two days before his deposition, so he could not

7

assess whether it would deliver pain-relief benefits.

The parties dispute the provenance of Gibson's carpal tunnel. Gibson alleges that it was ongoing throughout the period relevant to this suit and may have been caused by the 2012 cuffing incidents. The defendants, citing their medical expert, contend that the carpal tunnel was a complication from Gibson's severe osteoarthritis and probably manifested only just before it was diagnosed by Hill medical staff in mid-2016.

Gibson's second amended complaint includes two remaining claims.[4] In count 1 Gibson alleges, under 42 U.S.C. § 1983, that the individual defendants were deliberately indifferent to his objectively serious medical needs in violation of the Eighth Amendment. In count 2, he alleges that the individual defendants' employer, Wexford, was also deliberately indifferent under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The defendants have moved for summary judgment on both claims.

**Discussion**

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018). The Court views the evidence and draws all reasonable inferences in favor of the plaintiff. *See Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019). To survive summary judgment, Gibson must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v.*

---

[4] The Court previously dismissed counts 3 and 4. *See* dkt. no. 72.

*Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

Prison officials violate the Eighth Amendment's prohibition on cruel and unusual punishments if they are deliberately indifferent to an inmate's serious medical needs. *Id.* at 1048-49 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prevail on this claim, Gibson must show "that he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Id.* (internal quotation marks omitted). Gibson must also show that the official's deliberate indifference caused him to suffer some injury. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

**A.     Individual defendants**

Gibson's claims against the individual defendants can be sorted roughly into two categories. The first category includes claims related to Gibson's possible bicep rupture. Specifically, Gibson contends that his bicep rupture was an objectively serious medical condition and that he was denied both (1) testing such as an MRI or CAT scan and (2) effective treatment—namely, physical therapy. The second category includes claims stemming from Gibson's wrist and shoulder problems, most notably his severe carpal tunnel syndrome that required surgery in mid-2016. The Court addresses each in turn.

**1.     Bicep claims**

Gibson first contends that he was denied necessary testing and treatment for his bicep rupture—or, perhaps, multiple ruptures—soon after the 2012 handcuffing incidents. Specifically, he points to Williams's notation of a deformity in his left upper arm during her initial assessment and her deposition testimony that she believed follow

9

up was necessary to rule out a bicep rupture. Williams undisputedly referred Gibson to see Dr. Obaisi, presumably to follow up on her initial assessment. Dr. Obaisi did not refer Gibson for any additional diagnostic imaging but did refer him for physical therapy. Importantly, however, Gibson never got physical therapy. After Gibson's physical therapy referral languished on the waiting list for a year, Dr. Davis canceled the order because she concluded that the need was no longer acute since Gibson's injury was no longer sufficiently recent.

As an initial matter, the parties apparently do not dispute that the putative bicep rupture was an objectively serious medical condition. Nor do they dispute that at least some of the defendants were aware of Gibson's condition. The two remaining key disagreements are about whether physical therapy was necessary to treat the apparent bicep rupture—i.e., whether the failure to provide it caused Gibson harm—and, if so, whether the defendants acted with sufficient diligence in pursuit of that treatment to preclude liability for deliberate indifference.

First, the defendants contend that physical therapy was not necessary to treat Gibson's condition. Citing testimony from their expert witness, Dr. Grosskopf, they argue that the referral was purely precautionary and that its eventual cancellation was therefore harmless. Specifically, they point to Grosskopf's statements that "most" bicep ruptures "will heal and calm on their own and [do] not require a lot of care," Grosskopf Dep., Ex. E to Defs.' L.R. 56.1 Stmt., dkt. no. 126-6, at 16:5-7, and that bicep ruptures "all invariably heal," *id.* at 33:8. Such injuries often only require time and reasonable pain treatment. *Id.* at 29:10-13 (testifying that, "in a case of a biceps injury, since that's what we're talking about," a failure to provide physical therapy "won't affect the outcome

10

in terms of healing or ultimate outcome"). The defendants note that it is Gibson's burden to demonstrate that the failure to furnish physical therapy caused him harm and they contend that he has failed to point to evidence supporting such an inference.

Gibson argues that a reasonable jury could find that physical therapy was necessary and that the failure to provide it caused him harm. Like the defendants, Gibson relies on Dr. Grosskopf's testimony. Specifically, he points to Dr. Grosskopf's testimony that physical therapy may be used to "reduce pain . . . [and] restore motion and strength" in patients with ruptured biceps. *Id.* at 28:22-24. He also emphasizes Dr. Grosskopf's testimony that some people who suffer bicep ruptures—particularly older patients—may develop "permanent stiffness" without physical therapy. *Id.* at 34:13-15.

The Court concludes that, taking this evidence in the light most favorable to Gibson, a reasonable jury could infer that the failure to provide him physical therapy caused him injury. The question therefore becomes whether a reasonable jury could find that the defendants acted with deliberate indifference in failing to provide that care. As an initial matter, the Court notes that "[a] delay in treatment may show deliberate indifference of it exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015). As outlined above, Gibson first saw Williams about his wrist pain on August 13, 2014. She immediately referred him to Dr. Obaisi, whom he saw on August 15. It was at this visit that Dr. Obaisi initially referred Gibson for physical therapy. But, due to a significant backlog, that physical therapy had not yet occurred by August 2015 when Dr. Davis cancelled the order.

Because a delay may show deliberate indifference if it exacerbates an inmate's injury, *see id.*, a reasonable jury could conclude that Dr. Davis was deliberately

11

indifferent when she cancelled the physical therapy order. Specifically, should the jury choose to credit Dr. Rosskopf's testimony that physical therapy reduces pain caused by a bicep rupture and is sometimes necessary to avoid permanent complications, it could reasonably infer that Dr. Davis's choice to cancel the referral evinced deliberate indifference to those consequences. More generally, a jury could reasonable find that Gibson was subjected to an inappropriate catch-22: treatment was knowingly delayed, and then he was refused treatment because his injury was no longer recent. Dr. Davis is not entitled to summary judgment.

There is no evidence, on the other hand, that would permit a reasonable jury to find that either Dr. Obaisi or physician assistant Williams were deliberately indifferent to Gibson's bicep injury. Williams, for her part, saw Gibson for his arm pain and promptly referred him to see Dr. Obaisi for further assessment and treatment. Dr. Obaisi saw Gibson two days later and immediately referred him for physical therapy. Although there was inarguably a long delay between Dr. Obaisi's referral and the treatment—indeed, it undisputed that Gibson's referral was cancelled by Dr. Davis before he was able to receive treatment—it is just as clear that Dr. Obaisi attempted to provide that care. And Gibson "has presented no evidence that these delays were . . . within Dr. [Obaisi's or Williams's] control." See *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002). Rather, "[o]n this record . . . these delays look like features of the Wexford system of health care rather than anything [that Dr. Obaisi or Williams] controlled." See *Norwood v. Ghosh*, 723 F. App'x 357, 364 (7th Cir. 2018). Thus no reasonable jury could conclude that Dr. Obaisi or Williams were deliberately indifferent to Gibson's objectively serious medical need. They are entitled to summary judgment on this claim.

### 2. Wrist claims

Gibson also contends that his Eighth Amendment rights were violated by the defendants' failure to diagnose his severe carpal tunnel, which ultimately required surgery. Specifically, he notes that he was not diagnosed with carpal tunnel syndrome until after he was transferred to Hill Correctional Center. He contends that, had the defendants referred him for diagnostic imaging of his hands, wrists, and arms as he demanded on several occasions, they would have caught the condition and been able to treat it. Gibson argues that the defendants' failure to do so prolonged his pain and worsened his condition. *See Perez*, 793 F.3d at 777-78.

The defendants do not dispute that Gibson's wrist problems were objectively serious medical conditions or that he repeatedly requested a referral for an MRI or other diagnostic imaging. They focus their argument instead on whether the failure to conduct further testing caused Gibson harm. The defendants rely on evidence of his progressive and degenerative arthritis. Specifically, they point to Dr. Grosskopf's testimony during his deposition that the carpal tunnel syndrome that ultimately necessitated surgery after Gibson was transferred to Hill was caused by—not separate from—his degenerative arthritis. They also point out that Dr. Grosskopf opined, based on his review of Gibson's medical history, that the carpal tunnel syndrome had manifested "very recently" when it was diagnosed by the hand specialist. *See* Grosskopf Dep., Ex. E to Defs.' L.R. 56.1 Stmt., dkt. no. 126-6, at 95:19-21. Dr. Grosskopf apparently reached this conclusion after a detailed assessment of Gibson's wrist and arm symptoms throughout his time at Stateville, noting that Gibson simply did not present with symptoms indicating carpal tunnel until shortly before the diagnosis.

13

*See id.* at 95:10-97:21. The defendants also emphasize that the surgeon who ultimately operated on Gibson concluded that the acute carpal tunnel syndrome was "probably causing most of his symptoms." Notes of Dr. John Mahoney, Ex. 4 to Pl.'s L.R. 56.1 Stmt., dkt. no. 134-4, at 2.

Gibson asserts that the carpal tunnel syndrome was a longstanding issue that the Stateville medical team simply missed. He suggests that a referral to a specialist for more testing would have revealed the problem and that, as a result, the failure to make such a referral amounted to deliberate indifference. But Gibson points to no evidence that would permit a reasonable jury to find that more testing would have accomplished anything of significance.

Gibson must be able to provide more than speculation and bare argument to avoid summary judgment. *See Giles*, 914 F.3d at 1048. Specifically, he must point to evidence from which a reasonable jury could conclude that the alleged failure actually caused him harm. *See Gayton*, 593 F.3d at 620. It is not the case, as the defendants seem to suggest, that a plaintiff in Gibson's position is required to present testimony from a medical expert. *See Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). But he must present *some* admissible evidence that supports an inference of causation; he cannot rely exclusively on conclusory assertions. Because Gibson has not pointed to evidence from which a reasonable jury could conclude that the defendants could have acted to prevent or ameliorate his wrist pain—particularly in light of the overwhelming evidence to the contrary discussed above—the defendants are entitled to summary judgment on the claims related to Gibson's wrist pain.

14

## B. Wexford

Gibson also seeks to hold Wexford, a private corporation with which Illinois contracts for prison medical services, liable for violating his Eighth Amendment rights. Although the Seventh Circuit has questioned the wisdom of applying *Monell* to such private contractors, it has, at least for now, continued to apply the *Monell* standard. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). That is, "a private corporation cannot be held liable under [42 U.S.C.] § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Id.* This standard is satisfied where the plaintiff can point to evidence of "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019).[5]

First, Gibson contends that Wexford has policies that require its employees to provide limited care, leading to constitutional violations. He cites the contract between Wexford and the State of Illinois, which limits the number of routine specialist referrals Stateville officials may make without prior approval from the Illinois Department of Corrections. *See* Wexford Contract, Ex. 11 to Pl.'s L.R. 56.1 Stmt., dkt. no. 133-2,

---

[5] The law provides no support for the defendants' argument that Wexford cannot be liable if summary judgment is granted for the individual defendants. *See* Defs.' Br. in Supp. of Mot. for Summ. J., dkt. no. 125, at 14. Rather, "an organization might be liable even if its individual agents are not" where "institutional policies are themselves deliberately indifferent to the quality of care provided." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017); *see also Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303-05 (7th Cir. 2010) (rejecting the argument now advanced by the defendants).

15

¶ 2.2.3.7(b). Even within these limits, Wexford apparently requires non-emergency referrals to be vetted by a process called collegial review, which Gibson suggests is designed to stymie specialist referrals.

The Court concludes that Gibson has made an insufficient showing for his claims regarding referral limits to survive summary judgment. First, even accepting for the sake of argument that the contract provision in question is enforced as Gibson contends, he has not provided evidence from which a reasonable jury could find that the "express policy . . . cause[d] a constitutional deprivation." *Spiegel*, 915 F.3d at 617. As discussed above, Gibson was in fact referred for physical therapy irrespective of the policy. Although that referral was delayed and eventually cancelled, there is no evidence from which a reasonable jury could infer, for instance, that the referral limit was the cause of the delay or cancellation. Likewise, Gibson has not offered evidence from which a reasonable jury could find that the defendants' failure to refer him to any other specialist caused him any harm. Wexford is therefore entitled to summary judgment on this claim.

Second, Gibson contends that Wexford employees follow a widespread custom of ignoring complaints patients during medical visits about issues that were not specifically designated on the initial medical care request form completed by the patient before the visit. On this, Gibson points to his own testimony about Dr. Obaisi dismissing his complaints of pain during unrelated visits and apparently telling him to "put in another slip" if he wanted those problems addressed. Gibson Dep., Ex. A2 to Defs.' L.R. 56.1 Stmt., dkt. no. 126-2, at 122:14-124:23. This testimony is insufficient to allow Gibson to avoid summary judgment on this second claim. Even if a jury were to credit

16

Gibson's testimony that Dr. Obaisi followed a de facto one-issue-per-visit policy, Gibson has not pointed to evidence in the record from which a reasonable jury could conclude that this was "a widespread practice that is so permanent and well-settled that it constitutes a custom or practice" of Wexford itself, rather than an idiosyncrasy of Dr. Obaisi's care. *Spiegel*, 916 F.3d at 617; *see also Thomas*, 604 F.3d at 303-05 (discussing the definition of a "widespread practice" for the purposes of a *Monell* claim). Moreover, this argument partially rests on the same conclusory causation allegations the Court has rejected for lack of evidence. That is, Gibson contends that Dr. Obaisi's unwillingness to discuss issues unrelated to the medical request form that prompted each visit "led to four years of suffering and irreparable physical damage." Pl.'s Br. in Opp'n to Mot. for Summ. J., dkt. no. 132, at 13. But, as discussed previously, there is no admissible evidence that Dr. Obaisi's alleged refusal to discuss extraneous medical issues during patient visits—even if it were representative of a widespread Wexford policy—caused Gibson's acute wrist issues, which unrebutted evidence suggests began very shortly before they were diagnosed and treated by Hill Correctional Center medical staff.

Wexford is therefore entitled to summary judgment on Gibson's *Monell* claims.

## Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment in part [dkt. no. 114]. Summary judgment is granted in favor of all defendants on plaintiff's claims arising from his wrist pain and later carpal tunnel diagnosis; in favor of defendants Williams and Davis on plaintiff's claims regarding the failure to provide him with physical therapy; and in favor of Wexford on all claims against it. This leaves

17

for trial plaintiff's claim against Dr. Davis. The case is set for a status hearing on June 13, 2019 at 8:45 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

                                                            _____
                                                               MATTHEW F. KENNELLY
                                                               United States District Judge

Date: May 30, 2019